and we'll begin with Mr. McGovern. Good morning, Your Honors, and may it please the Court. This appeal involves two sets of claims, the first of which are products liability claims against the manufacturer, distributor, and leaser of the hot water trailer that caused Mr. George's injuries, and the second is a premises liability claim against SI Grp, which is the owner of the premises. Mr. Bailey, would you come up here a minute, please? Rather than attempt to address every argument that appellees made in their briefs, I think the best way to assist the Court would be to first precisely explain the nature of our claims against the products liability defendants, and then I'll touch on Chapter 95 and show you why it does not apply to this case. So beginning with our design defect claim, it's important to understand the nature of the hot water trailer, and if the Court would turn to Tab 3 of the bunch of exhibits we provided this morning, I think that'll be helpful in kind of understanding what we're talking about here. What you see is that these trailers are massive. They weigh 67,000 pounds and they hold 7,000 gallons of 2,200-degree water, which is enough water to wash a chemical tank for six hours, seven hours, without interruption. And what makes these pieces of equipment unreasonably dangerous was a Cezanne, which SI Grp's root cause report identified as one of the three causes of the tipping, and that's if you look at page 1134 of the record, you'll see that SI Grp concluded that the hot water trailer tipped because, quote, the weight of the trailer was concentrated on too small an area of the landing gear. And you can see this on Tab 3. So if you look at... What's your answer to the fact that, like, no one's ever done what you all had done that day that created that accident? So that that's just not how people handle it, so why is that something that should have been... Of course, you can always Monday morning quarterback any accident, but why would that have been predicted? That nobody's ever left the... That nobody's ever detached the tractor from the trailer? Right. I don't think there is any evidence in the record to support that nobody's ever... Well, they said that the tradition is keeping it hooked. Well, yes, that is how it's usually done, but there is nothing to say that that's how it has to be done. And when you look at... I mean, when you look at... The question here is whether we've actually pleaded an adequate claim of a design defect. And when you look at this picture here, you can see that what happened is that these two legs sunk right into the ground. So our first design defect is that the pads of the landing gear should have been wider. The way to think of this is like a snowshoe, right? If you walk on snow and you're just wearing your boot, you're gonna sink straight into the ground. You look at the picture, at the bottom picture on tab three, that's exactly what happened. The legs sunk straight down into the ground. Our first claim, our first alternative design that would have prevented this would be to have a wider landing, wider pads, like snowshoes. I mean, not like snowshoes, but you take the point. That would have distributed the weight better, and that would have prevented them from sinking into the ground. And our second alternative design is to spread the legs out farther. And the way to think about this is like a piece of luggage. I'm sure you've all had a piece of luggage that's kind of small, and if you know when you wobble it, it tilts back and forth and it falls over and it's kind of hard to keep it on track. Whereas larger pieces of luggage are more stable because they're spread out. Yeah, it falls over too. My big one. Correct, but not as easy, and that's the point, is that there was a way for it to be designed that would have prevented this accident. So those are our design defects claims, and those are very straightforward, and those are able to be proven at trial without any difficulty. What do you say about their argument that you did not propose an alternative design that was a feasible design in the allegations of your complaint? Which seems to be a requirement of a design defect. Well, yes, Your Honor, but I think that those are alternative designs. Those are differences between how it was designed and how it could have been designed that we would have been able to prove. I mean, did you allege that it could be designed at a reasonable cost, with no loss of effectiveness for the purpose of the utility of the instrument? Yes, Your Honor, we did. That's at page 709 of the record, where we talk about how it could have been designed with the correct facility. But that's actually not even required under this Court's jurisprudence. In the flag case that we cite in our brief, all you need to allege are enough facts to make a reasonable expectation that discovery will reveal evidence necessary to support the claim. And in the flag case . . . But if you allege it . . . I mean . . . What are you saying? You're complied with the flag case. Thank you very much. Under the flag case, your pleading was acceptable. Yes, Your Honor, because in the . . . But otherwise, it was not. I mean, in the flag case, it says significantly that if you may suggest the design defects can be cured in a particular way, that's satisfactory. But there are other cases I thought that held that there must be more specificity about the design that would accommodate both the utility and the cost related to the . . . curing the defect. Yes, Your Honor. But, I mean, again, at page 709 of our petition, we do allege that the alternative design would have been economically . . . would have been . . . sorry. It would not have been more expensive, and it would have prevented the . . . Is it enough to make such a conclusory allegation? Because, of course, you all are always going to say . . . anybody that is talking about an alternative design is always going to say that would have been easy, and then the reality often is, no, it wouldn't. So, is it enough to just make the conclusory allegation that, oh, this was cheap, or the same cost, or easy enough? Well, I think that gets into elements of proof as to whether you can actually make that sure or not. But, again, I would point again to the flag case, and the allegation there that was considered sufficient was, quote, that a different alloy, other than the one used, would have performed better, and that the composition negatively impacted its performance. And that was held sufficient. We're not speculating about what would have happened, and, again, our allegations are based on SI Group's report, which found that the issue was too large of a concentration of weight on too small of an area. And our alternative designs are . . . the width and the larger pads are designed specifically to address that concern that was found in SI Group's report, and to . . . I mean, that just seems like you're proposing something that is obvious to a lay person without any specificity as to whether it could actually be accomplished. Well, again, Your Honor, I think that . . . I don't think that you have to get into detailed allegations about precisely how it . . . about, you know, whether it has to be 105 . . . whether the pad has to be 105 square inches, or it has to be 200 square inches. You don't have to get into that. Don't you always say something like that, though? It could always be bigger. It could always be smaller. I mean, that would be true of sort of anything, and if that's enough, then this notion would never really matter, at least at the pleading stage, maybe at the jury stage. Well, but I think that is the point, Judge Haynes, which is that at this stage, at the early stage, the plaintiffs are never going to be in the position to actually have the information about precisely what could have been done differently. That information is in the possession of the defendants, and that's what this Court has said in previous cases, which is why at the pleading stage, all you have to do is raise enough to . . . again, this is from Flagg . . . enough tracks to raise . . . Are you under some obligation before you file your pleading to make an inquiry into the specific design that would cure the defect at a reasonable cost of no loss of utility? You are, Judge Jolly, and I think that's what we did. That's what the . . . our design is based upon SI Group's root cause report, which pinpointed the issue, which is that there's too much weight on too small of an area, and so that's why we allege that if you had widened the landing pads, that . . . and we aren't required to say how much yet. We said that you have to widen the landing pads, and I believe that that is sufficient under Flagg and the rest of this Court's jurisprudence on Rule 12b-6, because everything . . . I mean, at worst, you have to draw the inferences in our favor at this standpoint . . . at this point in the litigation, and I think that we certainly satisfy and are more detailed in Flagg in that we indicated how we think it would have cured it and what was wrong with the prior one, and we gave two alternatives. And now, if I could turn to the marketing defect claim. Let me ask you about Evergreen, because I'll tell you, as soon as I saw the information about Evergreen, I thought, but they're just the middle man, and so, of course, Texas lets them off the hook, but then you cited that issue of the bulk . . . Chapter 82, Your Honor. Yeah, the bulk tank international, but what I'm wondering is . . . I mean, I understand that argument, except that we have bulk tank services here, and so I'm . . . you know, you could always find some international company to sue that's kind of out in the middle of the woods, and then they don't show up, and then you defeat Chapter 82. That just doesn't seem right to me, since you have the local, if you will, bulk tank here, and they're going to argue, and they showed up. How does that defeat Chapter 82? Well, because Chapter 82 provides, this is 82A7B, provides that a seller that did not manufacture the product is not liable unless it can prove that the manufacturer of the product is not subject to the jurisdiction of this court. Bulk tank international, the Mexican entity, is the manufacturer of this product, so we can't make up who's the manufacturer. Well, then why is bulk tank services here? If they don't have a dog in the fight, then why are they here? And if they do have a dog in the fight, then that seems to sort of negate the notion of the unservable company in Mexico. Because bulk tank services, I believe, is the distributor of the product, and I'm sure I'll be corrected if that's not precise, but they're farther down the chain, and what Chapter 82 allows is if the manufacturer is not subject to service, it allows you to . . . and the purpose of this is if you cannot serve the manufacturer himself, bulk tank international, it puts everybody down the line on the hook, and then what it does is it allows them to bring that party into court, because they have the relationship with the party, and if they can get the manufacturer into court, then you see the manufacturer and those claims go away. What litigation did you have over the issue of bulk tank international? I'm sorry, I missed the first part. What litigation, what arguments did you have about that? Because it kind of seems like they've just been floating along, and the court has just kind of granted a final judgment that included them, and it's just kind of been moving along, but I may have missed where you all argued about it. I'm just wondering where that was. Well, I mean, the allegation is strict products liability for the marketing defect and for the design defect as the manufacturer of this. I mean, they're the parties that primarily should be the one in the case, but they're not subject to the jurisdiction of the court under Chapter 82, which allows the downstream players . . . No, but I'm asking, so maybe I'm not being clear. What arguments before the district court did you all have about whether bulk tank international was subject to the jurisdiction of the court? Oh, well, that's taken care of by Chapter 82.003C, which says that if you attempt to serve them pursuant to Chapter . . . sorry, Section . . . Chapter 17 of the Texas Civil Practice and Remedies Code, and that they do not answer or make an appearance, then it is conclusively presumed that they are not subject to the jurisdiction of the court. And so, our arguments against them would be the same arguments that we're making against all the downstream defendants, but what we established in our pleading is that they are not subject to the jurisdiction of the court. That presumption has never been rebutted, and therefore, it's conclusively presumed that they are not and that the non-manufacturing sellers, such as Evergreen and such as the rest of the bulk and Brenner defendants, are liable to them for their products liability claims. If I could turn briefly to the manufacturing defect claim, so pivoting from the design defects, if it is not the case, if it is the case that the hot water trailer was not designed to be used on this unstable surface, then it should have contained a warning to that effect. And the reason for that is borne out by what happened in this litigation, which is first, the routine use of the trailers, which there's testimony on this point in the record, is that one sits on its own legs on concrete, and the other sits in the staging area washing off the tanks. And it is absolutely foreseeable that somebody could look at the tanker sitting on its two legs on the concrete, look at the trailer sitting on the gravel, and think that trailer can stand on the gravel. There is no reason not to think that. At worst, that's a foreseeable misuse that somebody draw that conclusion. Are you going to say anything about the premises owner? Yes, absolutely, Your Honor. So if you turn to chapter 95, if you turn to page 1 on the exhibit set I gave you, I think this helps clarify things a little bit. So what you see here is this is prepared by SI group, and they identify two tank farms in red. TF3 is red right there, and there's TF4. That's tank farm 3 and tank farm 4. Now what INEO says is that there has to be a connection between separate systems in order for there to be considered the same improvement. And there is nothing, nothing in the record that says tank farm 3 and tank farm 4 are connected or that they're the same improvement. So right off the bat, we have two separate improvements at this site. And then you have the ground in between those two improvements. Now it is undisputed that George was washing a tank on tank farm 3, which is the F741 tank, and that's part of tank farm 3. And to say that tank farm 3 is part of tank 3, that that tank is part of tank farm 3, that's the INEO's decision. But that's not what they're asking for here. They're not asking for INEO's. They're asking for Hernandez, which is to say that you have one improvement, and then the area that supports that improvement is the same improvement. And that is not the case. In INEO's, I'm sorry, in Hernandez and in Air Liquide v. Cox, they held that the roof of a building that supports an air conditioner is a separate improvement than the air conditioner itself. And Texas law is clear that you have to be injured by the same improvement that you're hired to work on. There is no evidence that Mr. George was injured by the tank farm 3 system. And I'm out of time, so if I could reserve the remainder of my time for rebuttal. All right. Thank you. We'll take time for a vote. We'll turn to Mr. Lee on behalf of SI Group. May I please report? My name is Tim Lee. I represent SI Group. I'm going to mostly talk about the recent Texas Supreme Court case that we sent a letter in, and I'm going to consume most of my eight minutes doing that. But before I do that, let me make a few observations about Justice Haynes' first question concerning what's up here when Mr. Viola, who is the company that employs Mr. George, is doing something everybody agrees shouldn't be done when it drops that hot water tank on the gravel road. There are a couple of important things about that that are important to all of these parties. What's important to SI Group is that nobody at SI Group had any idea that Viola was going to detach the trailer from the cab. That wasn't the plan. What's the evidence that that had never been done? That was my perception, but your opposing counsel said there's no evidence of that. That's not true. At least at the SI Group facility, normally those tankers get set on hardened, what they call stabilized ground, and that's at 1336. That's a deposition. Specifically, the pinpoint site is page 27. There is some loose testimony from Viola witnesses that suggests that, well, sometimes we do drop them on surfaces other than pavement or concrete, but none of that relates to the SI Group facility. SI Group's procedure was you don't disconnect this kind of trailer unless you're on a hard surface. It's obviously going to be unstable if it's sitting on something that is soft. There's no discussion between this particular Viola crew and SI Group, and that's at 993, and there's lots of discussion on how the Viola crew inspected this particular spot  but SI Group's safety engineer says you never put a truck like this on unstable ground no matter how good it looks. Well, then why not give that warning? I'm sorry? Why not give it? Yeah. Because, well, actually SI Group does, subsequent to the accident, specifically advised. Oh, I'm sure that's true. I'm saying, like, if y'all knew that this is a bad idea, why not say that to Viola, and then if they violate your rules, that's on them. Because there wasn't any awareness that it was going to happen. Viola is supposed to be the expert in this procedure. Viola is supposed to be the party that knows what to do with the trailers, and SI Group is not controlling the detail of their work. Then it's perfectly okay for the premises owner to take the position of letting the independent contractor decide how to do its work, and if you don't have notice that they're doing it in a way that's manifestly incorrect, you don't have an obligation to do anything about it. All right, now was there anything that made the ground unstable other than the alleged leak? Your Honor, the testimony at 1041 to 1042 is from SI Group's safety engineer. He says it doesn't matter. You never put this kind of trailer on unstabilized surfaces, whether it's wet, whether it's dry. But, I mean, isn't the cause of the spill the wet soil and not the unstable soil as such, if you can separate the two? The only testimony that tries to sort that out is the testimony that I just referred to, and the safety engineer says it's going to go over no matter whether it's wet or not. The only leak . . . Did you say the issue of the leak doesn't matter? I thought y'all were saying that that was some hearsay that evidence . . . We don't believe that there ever was a leak, and we don't think that there is sufficient evidence to prove that there was a leak, but the point is that's kind of a red herring because even if there wasn't a leak, you have this accident likely occurring as soon as Melia drops the hot water trailer onto an unstabilized, that is, unpaved surface. It's almost . . . at least SI group's witnesses say it's going to go over if you do that. And what do you do with the record evidence between 1202 and 1215 that says that it's standard operating procedure to drop the tank onto the two legs? Oh, that's George's testimony, and that's not SI group's standard procedure. George testifies that he has done that at a Dow facility, that he has dropped it, but there is no testimony on SI group's facility with that standard procedure. Well, he also says that when you drive around the facility, because there's one . . . there's one tractor . . . I may be using the wrong terms, but there's one thing to do the towing to every two tanks to be towed. That's correct. That there's a whole bunch of them just sitting around on two legs. There are two . . . one's being used, one's heating. The one that's heating is on pavement. It is sitting on two legs on a paved surface, and that's the difference. When SI group is talking about stabilized surfaces, what they mean is it's paved or concreted over, and that's the way it was working in this particular situation until Yolia decided to drop the trailer because of the problem with the break air bag and the cab. It's certainly not accurate to say that they're never dropped under two legs. It sounds like 50 percent of the time they're dropped under two legs. Yes, that's correct. And the specific . . . But you're saying not on the gravel. That's correct. Or anything else that is unstabilized, that is unpaved. The Los Compadres Tuscadores . . . If this was such an obvious danger, and if it was so inexcusable to put it anywhere except on pavement, then why was that not a warning? Because you obviously had a lot of unpaved land around where it could have been conveniently dropped, but yet apparently the contractors did not know of the danger that you speak of now. The Beolia crew, Munoz in particular, testimony is that he knew he was increasing the risk by dropping the trailer on the unstabilized surface. Nobody communicated to SI Group that that was happening. SI Group didn't have any reason to think that it was going to happen. It's Beolia's expertise, not SI Group's expertise. That's why we're hiring them, is because they're the experts. I mean, is your position that it had never happened before? Is it your position that it had never happened until they dropped it on the alleged unstabilized ground in this instance? Yes, that's what our witnesses say, is that it does not happen at the SI Group facility, and they don't expect it to. I've got three seconds. Please look at Los Compadres Pescadores 622 SW 2nd 771. That case answers the question about does the hazard have to be in the improvement, and if you read it carefully, the Texas Supreme Court in April says no, it does not have to be a hazard coming from the improvement. It just has to be in the same proximate area. It's an extremely important case to SI Group in the Chapter 95 argument. Okay. Thank you very much. Rebecca, you're here for vault 10. May it please the Court. The first thing I would like to address is my colleague representing Mr. George told the Court that record on appeal at 1134 indicates a finding by SI Group or by Bailey, whoever did the, when they did the root cause analysis, that there was an affirmative finding that there was too much weight or too much pressure on a very narrow space of the landing gear, of the foot. If the Court will take a look at that, actually look at that citation, what it will find is that's a flow chart of various causes that were tossed out and tossed around as possibilities, and when you look closely at that flow chart, you'll see that it's inconclusive and there's a question mark by it. Further on that flow chart, however, is where the investigators actually plotted out all the way to its terminus, what they determined was the root cause, and that was a failure to look for stable ground. Now, no warning and no defect, or no design defect, no pleading about that, is going to overcome what's pled initially by the plaintiff in his fifth try, in his fourth amended petition, which is that this was caused by, according to the pleading, if we just look at the pleading, it was caused by the collapse beneath the feet of the trailer. Yeah, but he's saying if your feet were stronger, you wouldn't collapse. Exactly. So he's saying y'all should prepare for people messing up. So opposing counsel gave the Court the example of luggage and said narrow luggage, tip, do the wider luggage, not so much. That's why your luggage tips all the time. And that's not what happened here. What happened here was the ground opened up beneath the feet. This wasn't about instability. This wasn't about a trailer on stable ground or on concrete suddenly being pushed over or tipped over. This was the ground collapsing. This was, as was pled, unforeseeable. Now, this is an unforeseeable occurrence that the plaintiff now says— But is unforeseeable something we can decide on a 12B6 or more of a summary judgment or trial question? It's absolutely something that the Court can decide on a 12B6 when that is what the pleading states. When they tell you in their pleading the ground collapsed or disappeared underneath the trailer and the trailer falls into that hole and then says, but if there had been a warning to park it on . . . And then look through the pleading. You'll see various references to, well, concrete? Or how about a paved surface? Or how about a warning that says it has to be on a solid surface or something similar? The pleading is all over the place and never actually makes a really good suggestion. As Judge Hughes said, what do you want on the sticker? And they couldn't articulate it in the hearing. Judge Hughes perceived this and even said, look, this is common knowledge. He understood the Caterpillar case. The Caterpillar says, you know, there's no duty to warn among people in the industry what everybody knows and what is common knowledge. Now, we're told that George would have benefited from or been saved from a warning sticker that said don't do this or park it over here. George, nowhere in the pleading does it tell us that George ever parked, scouted, uncoupled, or did anything else to help with that trailer. We don't know through the pleading that George had . . . . . . . .  . . . . . . . . . . . . . . . No data supports that the legs were unsafe. In fact, Bok and Brenner testified that they worked safely and effectively. Do you think that's a proper application of the 12B6 standard? I don't know that that was . . . that necessarily indicates the best writing that a district court ought to do in dismissing a 12B6 motion, but this court in its de novo review does not have to consider that decision. Judge Hughes also purported that the Caterpillar for the the 12B6 motion the court can look to anything that's plead within the pleading. And in the pleading they make specific reference to the root cause analysis. And I understand the alternative grounds for affirmance in the summary judgment context we're talking about, for example, SI group I totally get that. And I know we said this in other cases where we can do alternative grounds for affirmance under 12B6. I'm curious though why we would do that. I mean, isn't the whole point of the pleading standard to allow the plaintiff to plead their best case and then you can deal with it in summary judgment and discovery to make them put them to their proof? But why would we sort of bend over backwards to scour the pleading ourselves? Why not let the district court do it? Well, that's just it. The court does not have to bend over backwards to scour the pleading. That's the case law. We don't have to scour the pleading to find the facially plausible case. This pleading contradicts itself everywhere. It says wider would have prevented this, but wider would not have prevented going straight down when the ground collapses. It is nothing but a bigger, better, wider and hope that the whole doesn't get bigger and better and wider. Can you just tell us about Bulk International? Like, where are they? You know, I know that's really an evergreen issue, but I asked the question and said, well, they didn't show up, so they're not subject to restriction. I think that's really the issue. And my answer will probably be disappointing. I came to this case later. My only understanding of the issue with Bulk International and Bulk Services is that during the early stage of the case, Bulk Services here in the United States allowed itself to become the defendant when Bulk International could not be reached. And I know that I've had cases . . .            I'm sorry. I'm sorry. I'm sorry. I'm sorry. I'm sorry. I'm sorry. I'm sorry. I'm sorry.    And you mentioned the exception for Bulk International. Is that what you're saying? I believe so, yes, ma'am. But you think that could defeat the exception to Chapter 82? I have not read that or I have not reviewed that closely. I can tell you . . . Yeah, I know that's not your problem, but I'm trying to just figure out all the pieces of it. I will tell you in my quick experience with that in the Houston case looking for contact lenses who manufactured some of these cosmetic contact lenses, we kept trying to get back as far as we could from the seller to the local distributor in Houston to an importer in New Jersey. And when we couldn't get overseas, we stopped at the importer in New Jersey and we were allowed to proceed on that. Okay. All right. Thank you. Thank you. And now Ms. Schick can come explain the Bulk International, Bulk Services, Bulky issue. Good morning, Your Honors. Jennifer Schick on behalf of Evergreen. Your Honors, in the complaint, what the plaintiff alleged was that there were multiple manufacturers. So yes, there was Bulk International, but there's also Brenner Tank, there's also the other Bulk entity. And they do indicate that Bulk International is in Mexico and at the time that we filed our motion had not yet answered. But the motion that we filed was based on the complaint in the 12b-6. In the 12b-6, they have listed two other defendants as they've captioned. And so let's, since we're supposed to take the pleadings as true, as written, if we have another manufacturer that was served and did answer, does that defeat this exception that Chapter 82 has? Yes, Your Honor. Okay. Tell me where it says that. Well, they would have to show that the manufacturer was properly served through the state and that they did not respond and that they were not subjected to the jurisdiction, which the paragraph in their complaint on 704, they do say, paragraph four, does say that they were served and has not yet answered. The problem for them, though, is that they go on to allege that Bulk Solutions and Brenner Tank, quote, the design and manufacturing defendants, designed, tested, assembled, and manufactured the tanker trailer. So according to this complaint, there are other manufacturers other than the one that was, they have not served. And in fairness, Evergreen did not attempt to try to serve them at this point yet because we were let out on the 12B6 based on this complaint where they're alleging that other Brenner Bulk entities were the manufacturers of this tank as well. That's what's contained in the complaint. That's what we look at for the 12B6 and that's what Evergreen relies on in application of Chapter 82. They don't allege any other facts that would support not applying Chapter 82. So that would mean Chapter 82 does apply. And you all are just a pure middle man. Correct, Your Honor. That's what Chapter 82 is about. Correct. In my prior life as a state district judge, that was my understanding of it. And that was the first thing that kind of popped into my head when I was looking at this. That is absolutely true. And the only allegations they make in here, as you've seen, are three paragraphs within the complaint. One, that Evergreen appeared through counsel, which was myself, and correct. Two, that they owned and leased a tanker trailer, which is correct and is contained. And then if you look on page 710, there is just one paragraph only listed about Evergreen that basically says Evergreen, as the owner, should have talked to SI Group about some sort of warning. They don't say what the warning was. They don't say that we had any knowledge of any warning that was necessary. There's nothing about knowledge, actual knowledge, nothing. It is literally one, two, three, four, five lines, not even, against Evergreen that just says Evergreen should have warned SI Group of hazards associated with parking the trailer while full on unpaved or unstable surfaces. How is that supposed to be communicated? What were we supposed to communicate? Did Evergreen even understand this? Evergreen leases empty trailers. Sometimes they're filled with hot water. Sometimes they're filled with chemicals. Sometimes they're filled with food storage products. They're filled in a variety of ways. They're transported by tractor trailer from location to location. And the only thing that Evergreen does is lease them to people who want to lease them. So Chapter 82 would apply here and would bar any claim against Evergreen. Also, the Graves Amendment would preempt any state law claims and preclude this claim against Evergreen. What if we didn't accept any of that? Where do you end up on the common law? There is no claim pled against Evergreen in this complaint. As you've just seen, the plaintiff is James George. James George and Evergreen don't come across anywhere together in this complaint. What George says is Evergreen should have warned a third party about something. I'm not going to say what it should have said or how it should have said or how it should have been connected. That's not a duty recognized under common law, under Texas law, under federal law. It's just not. You can't claim that my client owed a duty to a third party that could have, would have, should have, and somehow prevented an accident with Mr. George. There's just no negligence claim. There's no duty. There's no strict product liability claim because we didn't have a duty to warn SI Group or Mr. George of whatever it is we were supposed to warn them of contained in the complaint, which is unclear. Because there was no relationship, we simply leased this trailer. It seems as though what this is is a vicarious liability claim where they just throw in a should have told a third party about some sort of danger about parking this trailer, which is just not recognized under Texas law. Under Texas law, they have not pled a claim in this complaint, and it's properly dismissed against Evergreen. Thank you, Your Honors. Mr. McGovern, you had a lot to cover. Sorry, just a few very quick points in rebuttal. Just starting where we left off here, Evergreen talks about Chapter 82 and the Graves Amendment, and the way this discussion has proceeded and unfolded today just demonstrates that these are, these are not appropriate for determination on a 12B6 motion. To determine affirmative defenses on 12B6, they have to be apparent on the face of the complaint. We're asking questions about who is both international, whether they're a manufacturer, whether there's other manufacturers. But what about the fact that you pled these other guys were manufacturers in their year? Why doesn't that end the matter on? We refer to them as the manufacturing defendants. I believe the evidence in the case is that I believe that the other entities are distributors and they're farther down the line of distribution. But the point is that we've pled the elements as to the primary manufacturer, which is outside the jurisdiction, which puts everybody on the hook for strict liability all the way down the line, which gets to Evergreen's point about not, about the sufficiency of our pleadings. We've alleged Chapter 82. We've alleged that they are liable as a lessor under Chapter 82 and that they failed to warrant. That's sufficient to get through the pleading standards. And my citation for that would be the Ardron. It doesn't just let you say, hey, I think all these people messed up. I mean, it does require more detail than maybe in the old days when it was enough to just kind of say everybody messed up. Without question. And the reasons we discussed earlier, the failure to warrant, I think we've been fairly clear on what our failure to warrant is. And this goes to what Volk was saying, what are we asking for? We're saying if you're going to use this trailer on anything except for concrete, I'm sorry, use a hot water trailer on anything except for concrete, it has to be attached to a tractor. That's our warning. And if it's not supposed to be used on its own legs unless it's on concrete, they should have warned about that because that is a foreseeable misuse. And we are at the pleading stage right now as it relates to these defendants. And all we have to do is plead a foreseeable misuse. And all these questions about the facts, they contradict the standard of review here, which is just look at the pleadings, take them as true, and have we raised enough facts to make it plausible. Yeah, we need facts, not just conclusions, not just I wish somebody would have warned me. I mean, nobody's debating that Mr. George was quite injured, and it is a terrible event that occurred. And you always have the Monday morning quarterback. You always can say I wish X, Y, Z when you know what happened. And if that were enough, we would never grant summary judgment or 12B6 in these connoisseur claims. Right, but as we discussed earlier, I mean, if we're going to get into the evidence, the evidence discussed that these planks are sometimes dropped on their own two legs, as Judge Oldham noted. So all we have to do is plead. Those are facts pleaded, and we allege it as foreseeable that somebody might misuse it in this way. And that is our marketing defect claim in a nutshell. And so anyway, so the Chapter 82 Graves Amendment are not alternative grounds for affirming. We allege failure to warn against Evergreen. We allege Chapter 82. And this actually goes to the Argrindano opinion from, I believe, 2020, which talks about the sufficiency of pleadings, which said that all that was pleaded was that they're owed 18% interest under Chapter 542. And this Court held that because a certain subsection of 542 was the only provision that provided for 18% interest, that was sufficient because everybody knew where you were coming from. People knew what the claims were going to be. I feel like we haven't really had a chance to talk too much about Chapter 95, so I'm going to try to do that very quickly here at the end, which is – and I just want to focus on the evidence that they've presented and what that evidence shows. So what they have tried to say is that the tank farm that he was working on is the same improvement as, one, the fire monitoring system that was leaking, and, two, the staging area that actually collapsed. Now, when you look at the fire monitoring system, there is nothing. There is zero evidence in the record, none, that says the fire monitoring system is the same improvement as the tank farm system. There is nothing – none of the affidavits say that at all. So they just simply have not met their – What about the same location, the argument that your opponent made? Well, the same location is – I mean, that's Hernandez, that's Ineos, and that's Cox, is that the same location is not enough. If the same location was enough, the court in Hernandez would have held that the air conditioner that was sitting on a roof was the same improvement as the roof, but that's not the law under Texas. And, actually, that's exactly what the Supreme Court held or talked about yesterday in the Los Compadres decision, which said that we cannot define the improvement to include the entire workplace because if you do so, it would negate the statute's explicit limited applicability to injuries that arise from the condition or use of the improvements limited to intellectual property. It has to be the same improvement, that's Ineos, and that is not this case. Thank you, Your Honor. Okay, thank you. We appreciate everybody's arguments. The case is under submission.